**MARICULTURA DEL NORTE, S. de R.L. de C.V., et al., Plaintiffs,**

v.

**WORLD BUSINESS CAPITAL, INC., et al., Defendants.**

**No. 14 Civ. 10143 (CM)**

United States District Court, S.D. New York.

Signed November 24, 2015

Ilan Rosenberg, Jacob Charles Cohn, Gordon & Rees, LLP, Philadelphia, PA, Lee Henig–Elona, Gordon & Rees, LLP, Fordham Park, NJ, for Plaintiffs.

Brian Andrew Katz, Morgan Lewis & Bockius LLP, Martin S. Siegel, Brown Rudnick LLP, Bruce Wayne Bieber, Zimmet Bieber, L.L.P., Steven M. Bierman, Joel M. Mitnick, Sidley Austin LLP, New York, NY, Andrew J. Gallo, Morgan, Lewis & Bockius, L.L.P., Boston, MA, for Defendants.

## MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS AMERRA AND TASHJIAN'S MOTION TO DISMISS

McMahon, District Judge:

Plaintiffs Maricultura Del Norte, S. de R.L. de C.V. ("Marnor") and Servax Bleu, S. de R.L. de C.V. ("Servax") are partners in a joint venture. They farm and fish Bluefin Tuna off the coast of Baja California, Mexico, as does their chief competitor, Defendant Umami Sustainable Seafood, Inc. ("Umami").

In 2005, Marnor borrowed money from Defendant World Business Capital, Inc. ("WBC") to fund its operations. A few years later it defaulted on the loan, which was secured by Marnor's Mexican fishing vessels. WBC foreclosed on the vessels after Marnor's default, and the foreclosure proceedings are still ongoing in Mexico, where the vessels remained seized. Plaintiffs allege that they tried to pay off the loan, but WBC refused to tell them exactly how much in principal and interest was needed to pay off the loan in full. Lacking this information, Marnor was allegedly deprived of its contractual right to cure the default and obtain release of the vessels. To make matters worse, WBC then assigned the loan to Umami (Plaintiffs' prin-

cipal competitor), which also refused to provide a total payoff amount.

Umami allegedly sought and secured WBC's rights under the loan because it learned about Marnor's default from Umami's creditor, Defendant Amerra Capital Management, LLC ("Amerra"), and its managing director Defendant Craig A. Tashjian ("Tashjian," and together with Amerra, "Amerra Defendants"). Servax had disclosed Marnor's default to Amerra in connection with a potential bid for financing; Amerra allegedly promised to keep the information confidential, but broke its promise and informed Umami about Marnor's default so Umami could take over Marnor's loan from WBC. By eliminating the competition, Umami could become more profitable and repay the money it owed to Amerra.

Plaintiffs brought suit in this court alleging breach of contract, fraud, and related claims against all defendants. As against the Amerra Defendants, the complaint asserts claims for (1) breach of contract; (2) tortious interference with contractual relations; (3) fraud; and (4) violations of the Sherman Act.[1]

The Amerra Defendants now move to dismiss all claims against them.[2] For the reasons stated below, the motion is granted in part and denied in part.

## FACTS

Unless otherwise noted, the facts are taken from Plaintiffs' complaint and the exhibits attached to it.

## A. The Parties

Plaintiff Marnor is a privately-held Mexican company engaged in aquaculture and fishing operations off the coast of Baja California, Mexico.

Plaintiff Servax is also a privately-held Mexican company engaged in fish farming and exportation in Baja California, Mexico. In the spring and early summer of 2012, Servax, through its nonparty affiliate, Altex, entered into a joint venture agreement with Marnor.

Defendant WBC is a privately-held Delaware commercial finance company that specializes in providing loans to foreign businesses engaged in international trade with the U.S.

Defendant Umami is a publicly-traded Nevada company with operations that fish and farm Bluefin Tuna off the coast of Baja California, Mexico. Umami acquired WBC's loan to Marnor.

Defendant Amerra is a privately held Delaware principal investment firm focusing on agricultural investments.

Defendant Tashjian is a Managing Director of Amerra.

## B. The Underlying Loan and Plaintiffs' Joint Venture

In 2005, Plaintiff Marnor entered into a credit agreement with WBC ("the Credit Agreement"). Under the terms of the Credit Agreement, WBC agreed to loan Marnor up to $9.9 million so Marnor could expand and operate its aquaculture business. The loan was secured by a First Preferred Mexican Fleet Mortgage and

---

1. Plaintiffs also asserted a conversion claim against the Amerra Defendants in their complaint. In opposing the instant motions, Plaintiffs have stated that they "will stipulate to the dismissal, without prejudice, of their claim[ ] for ... conversion." Opp. to Umami and WBC's Motions to Dismiss at 1 n.1 (Docket # 72). I thus consider the conversion claim against the Amerra Defendants to be withdrawn.

2. The motions to dismiss filed by WBC and Umami will be dealt with in a separate opinion.

Second Preferred Mexican Ship Mortgage ("the Mortgages") on Marnor's vessels in favor of WBC.

Although Marnor discharged its obligations under the Credit Agreement for several years, it was in default by March 2010, at which point it owed $5.2 million in principal. Marnor continued to pay the interest on the loan through 2012, and until the latter half of 2012, WBC did not exercise any of its remedies under the Credit Agreement or the Mortgages—including its right to foreclose on the vessels. The Mortgages also provided that Marnor could cure its default at any time by making payment in full.

In the spring and early summer of 2012, Marnor negotiated with non-party Altex to create a joint venture between Marnor and an Altex affiliate, Plaintiff Servax. One reason for the joint venture was to use Servax's infusion of cash—an initial expenditure of $4 million—to help pay off Marnor's WBC loan. The Marnor/Servax joint venture included multiple agreements pursuant to which Marnor and Servax were to begin joint operations as soon as Marnor was able to eliminate all liens and encumbrances on its assets—at which point Servax would acquire substantially all of those assets. Despite efforts to cure its default, Marnor alleges that it could not do so because WBC refused to tell it how much was required to pay off the loan. The complaint does not explain why it was not possible for Marnor to calculate the amount.

### C. Amerra's Promise of Confidentiality and the WBC Assignment

In May 2012, Defendant Tashjian worked for Defendant Amerra; he was familiar with Servax from a previous job.

While working at Amerra, Tashjian learned about the joint venture between Servax and Marnor; he suggested that Amerra compete to finance the venture. Servax executives visited Amerra on September 5, 2012, and provided Amerra representatives with confidential information about the venture and Plaintiffs' financial position—including the fact that Marnor was under water on the WBC loan, which was secured by mortgages on Marnor's fleet. Amerra allegedly promised to keep this information confidential.

Amerra thereafter provided Servax with a proposed term sheet, but Servax declined the terms. Plaintiffs now claim that the financing discussions were merely bait Amerra used to procure confidential information.

Plaintiffs allege that, despite the promise of confidentiality, Amerra informed Umami, with whom it had a preexisting credit agreement, about the proposed joint venture and the fact that Marnor had defaulted on its loan with WBC. The complaint alleges, on information and belief, that Umami had exhausted its line of credit with Amerra, but that Amerra offered to extend additional credit to Umami, so that Umami could acquire Marnor's Credit Agreement and Mortgages from WBC. That acquisition allegedly enabled Umami to obtain a dominant position in the Bluefin Tuna market by the expedient of locking up its competitor's assets.

As permitted under the Mortgages, WBC began foreclosure proceedings in Mexico against Marnor's vessels in August 2012—before any of these events occurred. On or about February 8, 2013, WBC disclosed to the Mexican court that it had assigned its rights under the Credit Agreement and Mortgages to Marnor's principal competitor, Umami. This assignment gave Umami control over Marnor's vessels (which had been seized months earlier), during the course of the still-pending foreclosure proceedings in Mexico.

Since losing access to its vessels (which occurred when WBC seized them), Marnor's business has declined substantially. Because its fleet is not available to it, it has had to hire vessels on contract, and it has not been able to hire nearly the number it needs. It has ceased to compete meaningfully in the U.S. market. The complaint alleges that Umami has come to dominate the Bluefin Tuna import market in the United States.

Plaintiffs essentially allege that Amerra and Umami conspired to exclude them from the Bluefin Tuna market in the U.S. by exploiting the confidential information Servax revealed to Amerra.

## DISCUSSION

### A. Standard for Motion to Dismiss

■ In deciding a motion to dismiss under Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007).

■ However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937.

### B. Defendants' Motion to Dismiss is Granted in Part and Denied in Part

After withdrawing their conversion claim, *see supra* footnote 1, Plaintiffs have four remaining claims against the Amerra Defendants: breach of contract, fraud, tortious interference, and violations of the Sherman Act.

Because the alleged conduct involves Mexican companies doing business in Mexico, I must determine what law to apply to the three common-law claims. Federal law clearly applies to the Sherman Act claim.

The parties agree that New York law governs the breach of contract and fraud claims, because the underlying conduct occurred in New York. That agreement is sufficient for me to apply New York law to these claims without further analysis. *Fed. Ins. Co. v. Am. Home Assur. Co.,* 639 F.3d 557, 566 (2d Cir.2011).

The parties disagree about whether New York or Mexican law governs the tortious interference claim, but Plaintiffs do not state a claim against the Amerra Defendants for tortious interference under either.

### 1. Plaintiffs State a Claim for Breach of Contract

■ Plaintiffs claim that they divulged confidential information to the Amerra De-

fendants because Tashjian promised not to disclose that information to others. But Tashjian allegedly broke that promise and told Umami about Marnor's financial difficulties.

■ "Under New York law, the essential elements of an action for breach of contract are: (1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F.Supp.2d 246, 260 (S.D.N.Y.2002) (citation, quotation marks, and footnote omitted).

The contract Plaintiffs pled in their complaint appeared to be a Confidentiality Agreement dated April 20, 2012. They alleged that Tashjian's disclosure of Servax's confidential information was "a breach of the express terms of the Confidentiality Agreement," which they characterized as "a valid and enforceable contract." Compl., ¶ 263, 275. Plaintiffs did not attach the agreement to their complaint. When the Amerra Defendants moved to dismiss, they attached the subject Confidentiality Agreement, and the court may consider it on this motion. *Brody v. Liffey Van Lines, Inc.*, 2014 WL 2450807, at *3 (S.D.N.Y. May 29, 2014). This Confidentiality Agreement was not between Marnor or Servax and Amerra; rather, it bound Amerra to keep confidential any information it received from a company called VFT Global, which was one of the joint venturers in a separate Altex-backed joint venture. However, the complaint alleges that Amerra learned of the Marnor/Servax joint venture during these financing discussions with VFT Global and Altex; Amerra then opened discussions about financing the Marnor/Servax joint venture with Servax representatives.

Plaintiffs contend that this document is not the contract on which they rely. Their breach of contract claim arises from oral representations made by the Amerra Defendants that either (1) modified the scope of the Confidentiality Agreement to cover Altex's other affiliate, Servax, or (2) "created a new, valid agreement between the parties on the very same terms as the Confidentiality Agreement." Opp. Br. at 6. Plaintiffs attach declarations to their opposition brief to support their argument that Amerra made these oral promises. *See* Servitje Decl. (Docket # 76); Brot Decl. (Docket # 81); Rosenberg Decl. (Docket # 82).

I will not consider these declarations; it is well-settled that, "The contents of [such documents] may not be considered in ruling on the instant motion, as a plaintiff may not supplement a deficient pleading through additional facts contained in affidavits." *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, 2013 WL 866867, at *4 (S.D.N.Y.2013); *see also Goodman v. Port Auth. of New York & New Jersey*, 850 F.Supp.2d 363, 380 (S.D.N.Y.2012); *Madu Edozie v. Socketworks Ltd. Nigeria*, 265 F.R.D. 106, 122–123 (S.D.N.Y.2010).

Nonetheless, Plaintiffs' complaint contains enough factual averments to withstand the motion to dismiss. Plaintiffs' allege that:

- "Servax relied on Amerra's *express and implied assurances of confidentiality* in making [its] disclosures." Compl., ¶ 54 (emphasis added).

- "Amerra and Umami shared and relied on confidential corporate, financial and marketing information concerning Servax, which Servax supplied to Amerra *under assurances of confidentiality* in the course of underwriting the proposed financing facilities for Servax's joint

venture with Marnor." Compl., ¶ 152 (emphasis added).

- "Marnor and Servax's exports and sales of Bluefin Tuna in the United States were growing at high rates due to lower prices and a strategic marketing and sales plan (a plan disclosed to Amerra under breached *assurances of confidentiality* )." Compl., ¶ 211 (emphasis added).

- "Relying on Tashjian and Amerra's *assurances of confidentiality,* and their longtime relationship with Tashjian, Servax's principals made several disclosures of confidential information leading up to a meeting in New York on September 5, 2012." Compl., ¶ 359 (emphasis added).

New York law recognizes that parties may enter into oral contracts. *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.,* 383 F.Supp.2d 428, 440 (S.D.N.Y.2003). Parties may also orally modify written contracts that do not contain a no-oral-modifications clause, *see Healy v. Williams,* 30 A.D.3d 466, 818 N.Y.S.2d 121, 123 (2006); the Confidentiality Agreement attached to Defendants' papers contains no such clause.

Although Plaintiffs' claim is not artfully pleaded, I am mindful that, on a motion to dismiss, the "court is ... required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff." *Lee v. Sony BMG Music Entm't, Inc.,* 557 F.Supp.2d 418, 423 (S.D.N.Y.2008). From the allegations, one can draw the inference that Servax and the Amerra Defendants agreed that Servax would provide confidential information to Amerra during financing discussions in exchange for Amerra's promise to keep that information confidential. The allegations are enough to give rise to an inference that the Amerra Defendants were contractually bound to keep Servax's

information confidential; the complaint clearly alleges that they did not. Defendants can introduce evidence to refute the existence of any oral agreement or oral modification, but they are not entitled to dismissal at the pleading stage. The motion to dismiss Plaintiffs' breach of contract claim is denied.

### 2. Plaintiffs Fail to State a Claim for Fraud

Plaintiffs' fraud claim is based on the Amerra Defendants' promise to keep confidential the information Servax disclosed during the course of financing discussions. Defendants contend that the claim is duplicative of Plaintiffs' breach of contract claim, and in any case fails to allege fraud with the specificity required by Federal Rule of Civil Procedure 9(b). Defendants are correct that the claim is duplicative, so it does not matter whether the pleading satisfies Rule 9(b).

"It is axiomatic that a plaintiff cannot plead a fraud claim based on the same facts that underlie her breach of contract claim unless she (i) demonstrates a legal duty separate from the duty to perform under the contract; (ii) demonstrates a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seeks special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Druyan v. Jagger,* 508 F.Supp.2d 228, 239 (S.D.N.Y.2007).

Plaintiffs first argue that they should be allowed to plead their fraud claim in the alternative, but this is plainly not allowed under New York law. "It is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims ... regardless of whether the alleged contract is unenforceable." *Stillman v. Townsend,* No. 05 CIV 6612(WHP), 2006 WL 2067035, at *6 (S.D.N.Y. July 26, 2006). For this

reason, "the alternative pleadings rule does not permit a plaintiff to treat fraud and contract as interchangeable claims, and whether a plaintiff asserts contract claims is immaterial since the fraud claim must stand on its own." *Atla–Medine v. Crompton Corp.*, No. 00 CIV. 5901, 2001 WL 428249, at *1 (S.D.N.Y. Apr. 26, 2001); *see also Marriott Int'l, Inc. v. Downtown Athletic Club of New York City, Inc.*, No. 02 CIV. 3906, 2003 WL 21314056, at *7 (S.D.N.Y. June 9, 2003).

Therefore, to maintain their fraud claim, Plaintiffs must allege (i) a duty separate and apart from the contract duty, (ii) a misrepresentation extraneous or collateral to the contract, or (iii) special damages. *Druyan*, 508 F.Supp.2d at 239.

Plaintiffs argue that their fraud claim falls under exceptions (ii) and (iii) because they allege a misrepresentation collateral to the contract and that they suffered special damages.

Plaintiffs contend that their fraud claim relies on a fraudulent misrepresentation of a present fact—*i.e.*, that Tashjian had no intention of performing his obligations when he entered the agreement. Plaintiffs cite to *Lehman v. Dow Jones & Co.*, 783 F.2d 285 (2nd Cir.1986) to support this contention. But as Defendants point out, *Lehman* relied on two older New York cases which form part of what has been described as a "very puzzling line of New York cases" that depart from the traditional rule. *Cougar Audio, Inc. v. Reich*, No. 99 CIV. 4498, 2000 WL 420546, at *6 (S.D.N.Y. Apr. 18, 2000). In the time since *Lehman*, the Second Circuit has addressed the confusion in New York law and clarified that "intentionally-false statements ... [of] intent to perform under the contract [are] not sufficient to support a claim of fraud under New York law." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir.1996). "The Second Circuit and courts in this district have resolved the conflict between the state cases" and have "consistently dismissed fraud claims predicated on allegations that defendants did not intend to meet their contractual obligations." *Marriott Int'l, Inc. v. Downtown Athletic Club of New York City, Inc.*, No. 02 CIV. 3906, 2003 WL 21314056, at *6 (S.D.N.Y. June 9, 2003).

Judged against this standard, Plaintiff's fraud claim does not allege a misrepresentation collateral or extraneous to the contract. Plaintiffs in fact argue that the fraudulent misrepresentations are Tashjian's assurances of confidentiality, Opp. Br. at 10, but those are the very same contractual promises they allege Tashjian breached. If Tashjian's assurances were false, as I assume on a motion to dismiss, then Plaintiffs have asserted a breach of contract claim. As I have said before, a plaintiff "cannot, with a naked assertion that Defendants had no intention of complying with the terms of the agreement with plaintiffs, shoehorn a claim of fraud into a basic breach of contract dispute." *Raymond Weil, S.A. v. Theron*, 585 F.Supp.2d 473, 482 (S.D.N.Y.2008). Plaintiffs' fraud claim does not survive under the "extraneous or collateral" exception.

Next, Plaintiffs argue that this case falls into the exception for fraud claims in which the plaintiff "seeks special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Druyan*, 508 F.Supp.2d at 239. For a claim of "special damages" to permit assertion of both fraud and contract claims premised on similar facts, the plaintiff must show not that his damages were merely atypical, but that they were "a special consequence of the fraud and can be separated from the damages they can claim because of the alleged breach of

contract." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F.Supp.2d 419, 430 (S.D.N.Y.2004).

Plaintiffs argue that they adequately plead "special damages" because they allege "the loss of plaintiffs' tools of the trade to their competitor." Opp. Br. at 9. Plaintiffs do not say *why* these damages are a "special consequence of the fraud," and indeed these damages appear to be part and parcel of the damages that flow from the alleged breach of contract (*i.e.,* that the Amerra Defendants disclosed confidential information to Umami so Umami could acquire the WBC loans). Plaintiffs present no argument for why these damages should be treated as "special damages," and the court sees no reason why they would be.

Plaintiffs' fraud claim is dismissed.

### 3. Plaintiffs Fail to State a Claim for Tortious Interference

Plaintiffs allege that Defendants' refusal to allow Marnor to cure its default tortiously interfered with the Marnor/Servax joint venture contract.

#### i. Plaintiffs Fail to State a Claim Under Mexican Law

The parties submit declarations from experts on Mexican law, which I may consider in deciding the motion to dismiss. *See Bigio v. Coca–Cola Co.*, 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010) *aff'd*, 675 F.3d 163 (2d Cir.2012).

Defendants' expert states that Mexican law does not recognize a claim for tortious interference with contract. Zamora Decl.,¶ 133. General tort principles under Mexican law do not impose liability unless the allegedly tortious action is "in violation of a specific statute." *Id.* at ¶ 122. Zamora submits that the allegedly tortious conduct here would not be actionable under Mexican law.

Plaintiffs' multiple experts on Mexican law do not contradict Zamora's opinion. Although Plaintiffs argue in a footnote (without any citation to their experts' opinions) that an act need not be "illegal" under laws of Mexico for a tort claim to be recognized, neither Plaintiffs nor their experts dispute that an action must be "in violation of a specific statute" to constitute illegal activity under Mexican tort law. Opp. to WBC and Umami's Motions to Dismiss at 16 n.3 (Docket # 79). Plaintiffs do not argue that they have alleged any conduct that violates a specific statute in connection with their tortious interference claim.

Because Plaintiffs do not counter Defendants' expert's statement that no tort claim for tortious interference lies in these circumstances, Plaintiffs fail to state a claim under Mexican law.

#### ii. Plaintiffs Fail to State a Claim Under New York Law

The result is the same under New York law.

Under New York law, "the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir.2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996)). "A plaintiff must allege that there would not have been a breach *but for the activities of defendants.*" *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir.1990) (emphasis added) (quotation marks omitted).

The Amerra Defendants contend that there are no allegations to support the conclusion that their actions were the but-for cause of any breach.

Plaintiffs plead their tortious interference claim against all defendants. Plaintiffs allege that "WBC, OPIC, Umami, Tashjian and Amerra refused to accept payment in full and extinguish Marnor's debt, the mortgage on Marnor's fleet, or release Marnor's seized vessels." Compl. ¶ 290. They allege that this refusal caused a breach of joint venture agreements (which are not in the record) between Marnor and Servax that were entered into in the spring and early summer of 2012. These contracts allegedly "called for the extinguishment of all liens and encumbrances on Marnor's assets." *Id.* at ¶ 282, 291. According to Plaintiffs, Defendants' "refusal to allow Marnor to cure its default and extinguish the debt, and release Marnor's vessels from the seizure and the Mortgages resulted in a disruption of Marnor and Servax's joint venture by causing breaches of Marnor and Servax's underlying contracts and disrupting the performance of Marnor and Servax's obligations thereunder." *Id.* at ¶ 292. Plaintiffs thus argue that Defendants procured a breach of the joint venture contracts by not allowing Marnor to clear itself of all liens and encumbrances as required by those contracts.

The Amerra Defendants argue that they cannot be the but-for cause of the pleaded breach, because they were in no position to accept or reject any payment from Plaintiffs. Plaintiffs' complaint repeatedly characterizes the tortious conduct as Defendants' refusal to allow Marnor to cure its default and obtain release of its vessels. But Plaintiffs do not allege that the Amerra Defendants held any mortgage on the vessels, possessed the disputed fleet, or were owed any money. Rather, the Amer-

ra Defendants allegedly breached promises of confidentiality to Plaintiffs, informed Umami about Marnor's default, and conspired with Umami to exclude Marnor from the Bluefin Tuna market. Plaintiffs do not allege that Amerra was ever in a position to accept or refuse payment on the loan or direct Umami to accept or refuse payment on the loan. Plaintiffs do not allege that the Amerra Defendants had any say over what Umami did with the loan WBC assigned it.

Plaintiffs do not respond to this argument. In opposing the Amerra Defendants' motion to dismiss, they do not discuss the tortious interference claim. In their separate opposition to WBC and Umami's motions to dismiss (against whom the tortious interference claim is also pled), they discuss the tortious interference claim, but do not respond to the argument that the Amerra Defendants could not have caused the alleged breach of the Marnor/Sevax joint venture agreements. In that opposition brief, Plaintiffs do list the purported conspiracy between the Amerra Defendants and Umami as being a tortious action, although it is not so pleaded in the complaint (there, the only tortious conduct pleaded is all Defendants' refusal to accept payment and release the vessels). Opp. Br. at 17 (Docket # 72). But the "antitrust conspiracy" itself did not cause Marnor to breach any of the joint venture contracts; rather Plaintiffs alleged that the breach of the joint venture contracts stemmed from Marnor's inability to cure its default and redeem its vessels under Mortgages to which the Amerra Defendants were not a party. The Amerra Defendants were not in a position to accept any payment because they were not owed any money, and they could not release the vessels because they did not have them. There is no allegation that Amerra could have accepted payment or released the vessels. Only WBC, and then

Umami as its assignee, could have accepted payment and released the vessels.

The real cause of the breach of the joint venture agreements appears to be Marnor's failure to pay what it owes. But even if WBC or Umami did indeed prohibit Marnor from curing the default to frustrate the joint venture, Plaintiffs have alleged no facts suggesting that Amerra Defendants did anything to further this—or were in a position to do so.

Because the Amerra Defendants' conduct is not the but-for cause of any breach of contract, the tortious interference claim against them is dismissed.[3]

### 4. Plaintiffs Fail to State a Claim for Sherman Act Violations

■ "The Sherman Act prohibits, *inter alia,* 'every contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States.'" *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 182 (2d Cir.2012) (quoting 15 U.S.C. § 1). "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* (quotation marks, alterations, and citations omitted).

Plaintiffs allege that Amerra and Umami conspired to exclude Umami's main competitors, Marnor and Servax, from the Bluefin Tuna market. Eliminating the competition would give Umami ability "to control prices for a scarce resource over which cross-price elasticity of demand with respect to other types of tuna and fish is low or absent." Compl., ¶ 379. Amerra

allegedly agreed to fund Umami's acquisition of WBC's rights in Marnor's loan so that Umami could control the vessels secured by the Mortgages and thereby gain greater market control.

The Amerra Defendants argue that Plaintiffs' Sherman Act claim fails for three reasons: (1) the claim is barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"); (2) Plaintiffs lack antitrust standing and have not suffered antitrust injury; and (3) the complaint fails to plead facts that plausibly demonstrate a conspiracy within the meaning of Section 1 of the Sherman Act. Although the claim is not barred by the FTAIA, I find that Plaintiffs have failed to allege cognizable antitrust injury and therefore do not have antitrust standing. For this reason, I need not discuss whether the complaint adequately alleges a conspiracy under Section 1.

### A. The FTAIA Does Not Bar Plaintiffs' Claim

■ The FTAIA exempts certain kinds of foreign commerce from the Sherman Act. *Lotes Co., LTD v. Hon Hai Precision Indus. Co.,* 753 F.3d 395, 398 (2d Cir.2014).

The FTAIA provides that the Sherman Act "shall not apply to conduct involving trade or commerce (*other than import trade or import commerce*) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a per-

---

**3.** Plaintiffs also allege a claim for tortious interference with prospective business advantage, but do not brief it, so I deem the claim

abandoned. The result would be the same if they had briefed the issue.

son engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section."

15 U.S.C. § 6a (emphasis added).

■■■ According to its plain terms, the FTAIA leaves two types of foreign commerce within the reach of the Sherman Act: (1) import trade or import commerce, and (2) "conduct involving *nonimport* trade or *nonimport* commerce when that conduct (1) has a direct, substantial, and foreseeable effect on import trade or import commerce, and (2) the Sherman Act claim arises out of that effect." *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 904 F.Supp.2d 310, 317 (E.D.N.Y. 2012) (emphasis in original). Courts have sometimes referred to these as the "import exception" (or "import exclusion") and the "domestic effects exception." *See id.* at 316; *Lotes*, 753 F.3d at 411.

Defendants argue at length that the domestic effects exception does not apply, and thus conclude that the FTAIA bars this action. Def. Br. at 16–19. But as Plaintiffs point out, the relevant inquiry is not the domestic effects exception, but the import exception.

There is an ongoing and unresolved dispute among federal courts about the scope of the import exception. Some courts have construed it to only apply to "domestic importers" who seek to import foreign goods into the United States. *E.g., United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F.Supp.2d 1003, 1023 (N.D.Ill.2001); *S. Megga Telecomms. Ltd. v. Lucent Technologies, Inc.*, 1997 WL 86413, at *8 n. 22 (D.Del.1997). Other courts see no reason for such a restrictive reading of the exception, which on its face applies to any kind of import trade or commerce. *E.g., In re Vitamin C Antitrust Litig.*, 904 F.Supp.2d

310 (E.D.N.Y.2012); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 438 n. 3 (6th Cir.2012). Although the Second Circuit has not squarely addressed this issue, the latter view accords with the more recent and better-reasoned authority.

For example, in *In re Vitamin C Antitrust Litig.*, plaintiffs, who were direct purchasers of vitamin C supplements from Chinese manufacturers, alleged that the Chinese manufactures agreed to fix prices and suppress export volumes. The defendant manufacturers argued that the FTAIA barred the action for foreign purchasers who bought the product from the Chinese manufacturers. Rejecting this argument, the court held that the defendants' reading of the import exception was too narrow. Because "the FTAIA makes clear that not only import commerce, but conduct *involving* import commerce, is never removed from the reach of the Sherman Act ... the relevant inquiry is whether the defendants' alleged anticompetitive behavior 'was directed at an import market.'" *Id.* at 317 (quoting *Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002)). Because the plaintiff-purchasers alleged that the manufacturers conspired about the "price, volume of sales and exports to the United States," they sufficiently alleged conduct directed at an import market. *Id.* at 317. Indeed, "Even though many of the transactions at issue took place abroad among foreign parties, the intent and result of those transactions was the direct importation of vitamin C into the U.S." *Id.* Based on its reading of the import exception and the plaintiffs' allegations, the court found that the FTAIA did not bar the action. *Id.* at 318.

Similarly, in *Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir.2012) (en banc), the Seventh Circuit sitting *en banc* found that plaintiff purchasers of the mineral potash were not barred from asserting

their claims under the FTAIA because the alleged conduct involved import commerce. The defendant potash distributors were foreign entities that allegedly engaged in pricefixing, which inflated the prices paid by the plaintiff purchasers. The court noted that, although the FTAIA was motivated in part by international comity concerns, "Congress recognized that there was no need for this self-restraint with respect to imports, even though they represent part of the foreign commerce of the United States." *Id.* at 854. This makes sense, because, "Foreigners who want to earn money from the sale of goods or services in American markets should expect to have to comply with U.S. law." *Id.* The court found the facts alleged easily met the standard:

> There can be no question that the import commerce exclusion puts some of the conduct alleged in the Complaint outside the special rules created in the FTAIA for Sherman Act claims. The plaintiffs are U.S. entities that have purchased potash directly from members of the alleged cartel. The defendant members of the cartel are all located outside the United States. Those transactions that are directly between the plaintiff purchasers and the defendant cartel members *are* the import commerce of the United States in this sector.

*Id.* at 855 (emphasis in original).

 In sum, when anticompetitive activity is directed at an import market in the United States, the FTAIA does not apply. As the court stated in *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81, 85 (S.D.N.Y.1995), "Plaintiff contends that defendants' actions have precluded it from exporting goods into the United States. Consequently, plaintiff's pleading alleges an impact on import trade and import commerce into the United States."

The Second Circuit's recent opinion in *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir.2014) is not to the contrary. That case focused on the domestic effects exception to the FTAIA. There, a Taiwanese electronics manufacturer alleged that five of its competitors conspired to gain monopolistic power over the USB connector industry. The plaintiff did not import USB products into the United States, but instead sold them to other foreign entities that incorporated them into motherboards, which were then incorporated into finished products that were eventually shipped to the United States. The plaintiff's product was not directed at an import market in the same way that the products in *In re Vitamin C Antitrust Litig.* and *Minn–Chem* were. Rather, the plaintiff's product was a part of a chain of commerce that might eventually reach the United States. The Second Circuit did not consider whether the import exception would have applied in that case, but recognized that its interpretation of the domestic effects exception required leaving room for the FTAIA's "separate import exclusion," which concerns foreign anticompetitive conduct with an immediate impact on U.S. markets. *Id.* at 411. The court held that the action was barred by the FTAIA because it did not meet the domestic effects exception.

 Here, Plaintiffs allege an immediate impact on the U.S. Bluefin Tuna market. They are not component manufacturers whose products only reach the U.S. market after multiple iterations of incorporation into higher level products, like in *Lotes.* Rather, they allege that they themselves want to export Bluefin Tuna into the United States and are prevented from doing so because of Defendants' allegedly anticompetitive conduct. Thus, their claim implicates the FTAIA's import exception.

Plaintiffs allege that "Defendants' actions have substantially impaired *Plaintiffs' exports of Bluefin Tuna into the United States* thereby impacting United States import trade and commerce," Compl., ¶ 11 (emphasis added); that Defendants' conduct interfered with their "ability to conduct business freely in the United States Bluefin Tuna market," Compl., ¶ 206; and that Defendants' "agreements have materially limited Marnor and Servax's ability to capture, farm, and *export Bluefin Tuna into the United States*," Compl., ¶ 209 (emphasis added). The complaint also contains factual allegations describing the impact of Defendants' actions on the U.S. import market. *See, e.g.,* Compl., ¶¶ 211, 213, 379, 380, 393, 395, 398. Because these allegations are sufficient to describe conduct "involving ... import trade or commerce," the FTAIA does not bar this action.

## B. Plaintiffs Do Not Have Antitrust Standing

To establish antitrust standing, a plaintiff must demonstrate that the injury it suffered is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Defendants argue that Plaintiffs have not established that they have antitrust standing because they have not alleged cognizable antitrust injury.

In *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,* 711 F.3d 68 (2d Cir.2013), the court discussed the requirements for antitrust injury. There, a mobile radio distributor brought suit against a network of distributors for terminating his at-will radio distribution contract. The network was allegedly engaged in a bid-rigging scheme to defraud state and city agencies purchasing the radios, and the plaintiff was a former member of that scheme. He argued that he was injured by the termination of his contract, which was designed to further the remaining members' illegal bid rigging scheme. As the court put it, "the illegal 'practice' [plaintiff] alleges is the carrying out of an illegal bid-rigging scheme, and [plaintiffs] alleged injury is the harm it suffered as a consequence of its inability to continue selling [radio] products. This harm only supports antitrust injury, however, if it flows from that which makes the bid-rigging scheme unlawful." *Id.* at 77. Noting that bid-rigging is illegal because it causes consumers to pay inflated prices, the court found that the plaintiff's "lost revenue resulting from the [distribution contract] termination ... is not an injury that flows from that which makes bid-rigging unlawful." *Id.* The court concluded, "Even if the antitrust laws seek to prevent [the conspirators'] alleged activities because of resulting harms to *competition,* these laws are not concerned with injuries to *competitors* such as [plaintiff] resulting from their participation in or exile from such schemes." *Id.* (emphasis in original).

As Plaintiffs correctly point out, courts have not read *Gatts* to imply that competitors cannot suffer antitrust injury or that lost revenue cannot constitute antitrust injury. As my colleague, Judge Cote, noted in *DNAML Pty, Ltd. v. Apple Inc.,* 25 F.Supp.3d 422, 429 (S.D.N.Y.2014), "*Gatt* does not stand for the broad proposition that a distributor's lost profits from a manufacturer's price-fixing conspiracy do not constitute antitrust injury." Rather, *Gatt* was based on the fact that the plaintiff's injury in that case—lost revenue from being excluded from a bid rigging scheme—did not "flow[ ] from that which makes the bid-rigging scheme unlawful." *Gatt,* 711 F.3d at 77.

Similarly here, Plaintiffs' alleged injuries do not flow from that which makes the allegedly anticompetitive conduct unlawful.

Plaintiffs allege injuries in the form of exclusion from competition, lost profits, lowered output, and increased prices. Compl., ¶¶ 206–213; 378–380. They allege that, "By significantly impairing and foreclosing Marnor and Servax's ability to compete in the Bluefin Tuna market, Umami and Amerra impaired competition in the Bluefin Tuna market leading to increased prices for Bluefin Tuna." *Id.* at ¶ 210. But although Plaintiffs allege that *the market* was harmed, they do not and cannot allege that *their injury* flows from Defendants' alleged conspiracy in restraint of trade. Rather, the source of their injury is that their fishing vessels have been seized. This is not a consequence of the unlawful conspiracy, but of Marnor's failure to pay what it owes on its loan. A lender's exercise of its rights under the Mortgages, including foreclosing on the vessels, is not conduct prohibited by the antitrust laws. Plaintiffs do not allege that the vessels would be back in their hands by now if it were not for the alleged conspiracy; nor could they, because lawfully instituted foreclosure proceedings are still underway in Mexico. In short, Plaintiffs cannot establish antitrust injury because their injury flows from Marnor's default, not from the Amerra Defendants' alleged conspiracy.

Plaintiffs thus do not have antitrust standing to pursue their Sherman Act claim. It is dismissed.

## CONCLUSION

For the foregoing reasons, the Amerra Defendants' motion to dismiss is granted in part and denied in part. The Clerk of the Court is directed to remove Docket No. 66 from the Court's list of pending motions.